UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11302-NG

| | |
|---|---|
| AFTERMATH CLEANING COMPANY, INC., )<br> Plaintiff, )<br>v. )<br> )<br>AFTERMATH, INC., )<br> Defendant. ) | MEMORANDUM IN SUPPORT<br>OF PLAINTIFF'S MOTION FOR<br>A PRELIMINARY INJUNCTION |

## INTRODUCTION

The plaintiff, Aftermath Cleaning Company, Inc. ("Aftermath") seeks a preliminary injunction

to prevent the defendant, Aftermath, Inc., from continuing to mislead consumers and harm the

plaintiff's business by using the plaintiff's trademark in connection with the defendant's business, in

Massachusetts, Rhode Island, Connecticut and New Hampshire (the "New England States"). The

defendant's activities have created multiple instances of actual consumer confusion and will continue

to mislead consumers and harm the plaintiff's trademark and business if not stopped.

The plaintiff is a company specializing in the cleaning and restoring of bio-hazard sites at

trauma and crime scenes. It has been in business since on or about February 1999 using the trademark

"AFTERMATH" and providing services primarily in the New England States. The plaintiff's

distinctive "AFTERMATH" trademark is well known in the New England States and has been

associated with one source, the plaintiff. The defendant is an Illinois-based company which also

specializes in the cleaning and restoring of crime and trauma scenes. The defendant recently began

conducting business in the New England States using the mark "Aftermath."

Since the defendant began to solicit and conduct business in the New England States using the

plaintiff's trademark, there have been multiple instances of actual consumer confusion and there likely

will continue to be significant consumer confusion and harm to the plaintiff's business and trademark

if the defendant is not stopped. The plaintiff asks the Court to preliminarily enjoin the defendant from

1

any further use of the plaintiff's trademark in the New England States, to enjoin any further solicitation of the plaintiff's customers or misappropriation of the plaintiff's business by the defendant in those states, and to require the defendant to take certain actions to mitigate the infringement and resulting confusion that has occurred.

## FACTS

### I.    THE PLAINTIFF'S BUSINESS AND TRADEMARKS

The plaintiff specializes in cleaning and restoring bio-hazard sites at trauma and crime scenes. Affidavit of Michael Wiseman ("Wiseman Aff.") at ¶ 1. The plaintiff has conducted business under the distinctive trademark "AFTERMATH" in Massachusetts, Rhode Island, Connecticut and New Hampshire continuously since 1999.[1] Id. at ¶ 2. The majority of the plaintiff's business comes from referrals to affected families from local and state police departments, housing authorities, property management companies, hotels, and funeral homes. Id. at ¶ 3.

The plaintiff was founded in the spring of 1999 by Michael Wiseman. Id. at ¶ 8. After his wife's relative died in her home and her family could not find anyone to clean up the site, Mr. Wiseman realized that this type of business was needed and set about developing it. Id. Mr. Wiseman's wife suggested the name "Aftermath" in February 1999, and Mr. Wiseman began using the name immediately thereafter. Id. at ¶ 11. The company was incorporated as Aftermath Cleaning Company, Inc. on August 31, 1999. Id. at ¶ 9.

### II.    PROMOTION OF THE PLAINTIFF'S TRADEMARKS

The plaintiff has extensively promoted its trademarks in the New England States since February 1999. Id. at ¶ 14. The plaintiff's activities in February 1999 consisted primarily of word of

---

[1] The plaintiff's first job in Massachusetts was in March 1999, the plaintiff's first job in Rhode Island was in late March 1999 or early April 1999, and the plaintiff's first jobs in Connecticut and New Hampshire were in or near September 1999. Wiseman Aff. at ¶ 27. Since that time, the plaintiff has performed jobs continuously in each of these states. Id. In the year 2000, the plaintiff performed about 200 jobs in the New England States. Id. at ¶ 27. That number has been steadily increasing in each year since. Id. In 2004, the plaintiff performed about 650 jobs in the New England States. Id. However, in 2005, for the first time, the number of jobs performed by the plaintiff stayed about level. Id.

2

mouth advertising, including speaking with local police and other potential customers about starting the business using the name Aftermath. Id. at ¶ 15. On March 1, 1999, Mr. Wiseman set up a local post office box to receive Aftermath's mail. Id. at ¶ 16. In March 1999, Mr. Wiseman printed 2,850 flyers displaying the "AFTERMATH" mark, which he mailed to every police department, both state and local, and every housing authority in the New England States. Id. at ¶ 17. In March 1999, Mr. Wiseman also printed over 4,000 business cards with the "AFTERMATH" mark, many of which were distributed with the flyers. Id. at ¶ 18. Mr. Wiseman mailed these flyers and business cards to the plaintiff's customers and potential customers in 2000, 2001, and 2002. Id. at ¶ 19. In addition, from 1999 – 2003, Mr. Wiseman spent in excess of $30,000 annually on Yellow Pages advertisements for "AFTERMATH" in Massachusetts, Rhode Island and New Hampshire. Id. at ¶ 20.

Beginning in 2003, the plaintiff began providing free bio-hazard training to the local and state police departments, local housing authorities, management companies, and trade associations/unions, and provided the attendees with duffle bags, which prominently displayed the Aftermath name and were filled with bio-hazard gear (e.g. gloves, suits, goggles, etc.) and written materials prominently displaying the "AFTERMATH" trademark. Id. at ¶ 21. The plaintiff donated one bag per police cruiser to the state police, as well as to the local police departments in approximately 100 towns. Id. The plaintiff spent approximately $100,000 on this effort in 2003, and approximately $200,000 on this effort in 2004. Id. At this point, virtually every state police vehicle in Massachusetts and Rhode Island has been provided with duffle bags and gear bearing the "AFTERMATH" trademark.[2] Id. Since 2003, the plaintiff has employed a police officer at least two days a week to focus exclusively on networking and promoting the plaintiff's business and services in the New England States. Id. at ¶ 23.

On May 26, 2000, the plaintiff set up a website at www.aftermathcleaning.com, which has been running continuously since that date. Id. at ¶ 22. The plaintiff also has created promotional items with

---

[2] The plaintiff intends to distribute these "kits" to police in New Hampshire and Connecticut as well. Wiseman Aff. at ¶ 21.

the "AFTERMATH" mark, including, without limitation, hats, t-shirts, fleece jackets, pens and key chains. Id. at ¶ 24. The plaintiff's employees have worn and used this gear since 1999, and the gear has been distributed to police and other customers at job sites in the New England States since 1999. Id. Since 1999, the plaintiff has spent in excess of $30,000 on such items. Id. The plaintiff also uses three trucks which prominently display the "AFTERMATH" mark on their sides, and places orange traffic cones with large stickers containing the "AFTERMATH" mark to cordon off the area around a crime or trauma scene. Id. at ¶ 25.

Moreover, there has been significant publicity about the plaintiff's business and services. The Boston Globe and other well-known publications in the New England States have published several articles about the plaintiff's business. Id. at ¶ 26. In addition, a profile of the plaintiff's business appeared on FOX TV News in June 2005. Id.

III.    THE DEFENDANT'S SELECTION AND USE OF THE INFRINGING MARK

The defendant, Aftermath, Inc., is an Illinois-based company which, like the plaintiff, cleans and restores trauma and crime scenes. Id. at ¶ 29. The plaintiff has been a member of the American Bio-Recovery Association ("ABRA"), a non-profit industry group that offers bio-hazard training and certification, since July 1999. Id. at ¶ 10. On or about September 1999, Mr. Wiseman attended an ABRA conference in Las Vegas. Id. at ¶ 12. Tim Reifsteck and Chris Wilson, who began the defendant company, attended that conference but registered for it under the name "After Crime Cleanup, Inc." Id. At the conference, after the plaintiff's business was introduced as "Aftermath Cleaning Company, Inc.," Mssrs. Reifsteck and Wilson mentioned that they liked the name "Aftermath" and, soon thereafter, the defendant changed its company name to "Aftermath, Inc." Id.

The defendant recently began to provide the identical types of services that the plaintiff provides in the New England States using the name "Aftermath." Id. at ¶ 30. The defendant filed for federal trademark registration for "Aftermath" on February 4, 2002, and received the registration on

4

April 15, 2003.[3] Affidavit of Brenda Cotter ("Cotter Aff.") at ¶ 2. However, the plaintiff's use of "AFTERMATH" is senior to the defendant's use or registration in each of the New England States.

## IV.    ACTUAL AND LIKELY CONTINUED CONFUSION

On or about April 2004, the plaintiff first learned that the defendant had performed a job in Massachusetts using the name "Aftermath." Id. at ¶ 35. The plaintiff received a call from a detective handling a violent crime in Norfolk County, to request a restocking of supplies, but was not contacted to clean the crime scene. Id. at ¶ 36. Approximately one month later, the plaintiff received a call from a person complaining about the clean up job at that site. Id.[4] The plaintiff later learned from the state trooper who had handled the crime scene that he had instructed the victim's family to contact "Aftermath," intending for them to contact the plaintiff. Id. at ¶ 37. The family inadvertently contacted the defendant, who performed the job. Id.

After this incident, the plaintiff spoke to the defendant, who admitted that the defendant had performed the job by sending in a crew from New Jersey. Id. at ¶ 38. The defendant explained that it was not a big job, and referred to the plaintiff as a "small operation." Id. The plaintiff explained to the defendant that it performs in excess of 500 jobs annually. Id. The plaintiff left the conversation under the impression that this was an isolated incident and that the defendant would not be a presence in the New England States. Id. This impression also was based on the fact that in the past, when customers

---

[3] There is a serious question as to the validity of the defendant's federal trademark. The defendant applied for a federal trademark registration of "Aftermath" on February 4, 2002. In support of the defendant's application, on September 24, 2002, the defendant's counsel, on behalf of the defendant, stated in a declaration to the United States Patent and Trademark Office ("USPTO") that "to the best of my knowledge and belief, no other person, firm, corporation, or association has the right to use the mark in commerce." See Cotter Aff. at ¶ 3. However, at the time of this declaration, the plaintiff was already using the "AFTERMATH" mark in commerce, and the defendant was aware of this fact based on the parties having met at the ABRA conference in September 1999. The plaintiff has alleged in the Complaint that by making this false representation to the USPTO, the defendant deliberately attempted to mislead the USPTO into registering the "Aftermath" mark for the defendant, which constitutes fraudulent procurement of a trademark registration in violation of 15 U.S.C. §1051(a)(3).

[4] This example of confusion also demonstrates the tarnishment that the defendant's use of the plaintiff's mark has caused to the plaintiff's reputation. As another example, on or about June 7, 2005, the plaintiff received a call from an inspector at the New Jersey Department of the Environmental Protection Agency, who mentioned various violations by "Aftermath," including performing jobs and failing to properly report them to the appropriate government agencies. Wiseman Aff. at ¶ 46. She mentioned that she had already spoken to "Aftermath" about these violations. Id. The inspector later realized that she had intended to contact the defendant rather than the plaintiff, who does not perform services in New Jersey. Id.

had accidentally contacted either of the parties looking for the other company (which happened about once or twice annually), the parties would refer those calls to each other. Id. The plaintiff heard nothing more from or about the defendant's operations for at least eight months after that. Id.

However, beginning early in 2005, there were several more instances of actual confusion in connection with the defendant's activities. Id. at ¶ 39. For example, State Street Development Management Company ("State Street") has been a customer of the plaintiff since 2001. Id. at ¶ 40. State Street manages approximately 60-80 properties in Massachusetts, Rhode Island, and Connecticut, and the plaintiff has performed multiple jobs for State Street. Id. at ¶ 40; Affidavit of Mary Lou Walker Seitz ("Walker Seitz Aff.") at ¶ 2. Mary Lou Walker Seitz of State Street recently informed the plaintiff that her company referred a job to the defendant thinking that it was hiring the plaintiff. Wiseman Aff. at ¶ 40; Walker Seitz Aff. at ¶ 4-11. Likewise, the plaintiff's customer, Kane Funeral Home, inadvertently referred a matter to the defendant thinking it was the plaintiff. Wiseman Aff. at ¶ 41; Affidavit of Stephen Raymond ("Raymond Aff.") at ¶ 5-7. Recently, the plaintiff received a check from Equity Properties, one of the plaintiff's largest clients. Wiseman Aff. at ¶ 42. After being unable to match the check to an invoice, the plaintiff realized the check was intended for the defendant. Id.

Recently, the defendant mailed both magnets and calendars to customers in Massachusetts and, on information and belief, Rhode Island, Connecticut and New Hampshire. Id. at ¶ 32. Neither the magnet nor the calendar list an address for the company, and the calendar states, falsely, "locally owned and operated." Id. at ¶ 33. On multiple occasions, customers have assumed that these calendars and magnets were distributed by the plaintiff. Id. at ¶ 34.

For example, in March 2005, the plaintiff received a call from a Stoughton police officer, who had intended to contact the plaintiff about a job. Id. at ¶ 43. The officer inadvertently contacted the defendant, who quoted him a four-hour response time. Id. The officer knew that the plaintiff typically arrives at the scene within an hour of receiving a call, so he contacted the plaintiff. Id. The officer

6

then realized that he had mistakenly first called the defendant by dialing the number off a calendar or magnet he had received in the mail from the defendant. Id.

On or about April 2005, the plaintiff contacted a building manager about a potential job. Id. at ¶ 44. The building manager indicated that she had just contacted the plaintiff based on a number that the police had given her; however, the plaintiff had not received the call. Id. The plaintiff later determined that the police had accidentally given the building manager the defendant's phone number based on marketing materials that the police received from the defendant. Id. Also in or about April 2005, the plaintiff left its brochure at the site of a crime. Id. at ¶ 45. Two weeks later, the plaintiff received a call saying that the plaintiff could expect to hear from an attorney shortly about a new job. Id. Later in the day, it was determined that the attorney had already accidentally contacted the defendant, rather than the plaintiff, based on a phone number he received from the Middleboro Police. Id. The dispatcher for the Middleboro Police indicated that he had accidentally given the attorney the defendant's number based on a magnet the dispatcher received from the defendant, which the dispatcher thought was from the plaintiff. Id.

V.    IRREPARABLE HARM

The plaintiff has invested many years of time and substantial funds promoting its distinctive "AFTERMATH" trademark in the New England States. Id. at ¶ 47. Since the defendant has begun to conduct business in the New England States using the plaintiff's "AFTERMATH" mark, the plaintiff has lost several jobs due to customers being confused about which Aftermath they were dealing with. Id. at ¶ 48. The name "AFTERMATH" has already lost some value and association in connection with the plaintiff's business. Id. If the defendant's conduct is permitted to continue, the name "AFTERMATH" will lose its association with the plaintiff's business, causing the plaintiff to lose the years of goodwill it has built in connection with that mark. Id. The defendant's use of the plaintiff's

"AFTERMATH" mark has already caused the plaintiff lost business opportunities and it will continue to do so if the defendant is not stopped. Id.

## LEGAL ANALYSIS

### I. STANDARD OF REVIEW.

A preliminary injunction is properly issued when the moving party shows: (1) a likelihood of success on the merits; (2) irreparable harm will result from the denial of the injunction; (3) the risk of irreparable harm to the moving party outweighs the potential harm to the non-moving party in granting the injunction; and (4) a preliminary injunction is in the public interest. See, e.g., Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996); Public Serv. Co. of N.M. v. Nexus Energy Software, Inc., 36 F.Supp.2d 436, 437 (D.Mass. 1999). As discussed below, the plaintiff amply satisfies each of these tests for a preliminary injunction.

### II. THE PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

#### A. The Plaintiff Will Succeed on Its Common-Law Trademark Infringement Claim.

The Massachusetts common law doctrine of unfair competition comprehends an action for the copying of trademarks and other features of a product or service that are likely to result in confusion as to source. Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 768-69 (1986) ("Datacomm"). In this case, the defendant's copying of the plaintiff's trademark has already caused multiple instances of customer confusion, and is likely to continue to cause confusion unless stopped. Accordingly, the plaintiff is likely to succeed on this claim, as discussed below.

##### 1. The Plaintiff is the owner of a valid trademark.

The plaintiff, Aftermath, owns and operates a well-known business that has been providing services under the trademark "AFTERMATH" in the New England States since 1999. The plaintiff's "AFTERMATH" mark is well-known throughout the New England States, including among state and local police departments, local housing authorities, building managers, and other customers.

8

Moreover, the trademark "AFTERMATH" is suggestive (as opposed to descriptive) and accordingly is entitled to trademark protection immediately on use without proof of secondary meaning. See, e.g., Equine Technologies, Inc. v. Equitechnology, Inc., 68 F.3d 542, 544 n.2 (1st Cir. 1995).

The plaintiff is the first user of the "AFTERMATH" trademark in the New England States, and, therefore, is the proper owner of that mark in those states. The fact that the defendant filed for a federal registration for its mark in 2002 does not affect the plaintiff's common law senior right to use its mark in the states in which it first conducted business.[5] "Neither the application for nor registration of a mark at the federal level wipes out the prior non-registered, common law rights of others. The non-registered rights of a senior user continue and are not erased by the later federal registration of a junior user." 4 MCCARTHY ON TRADEMARKS § 26.53, P. 26-92 (4TH ED. 2005); see also MCCARTHY at § 26:31, P. 26-51 ("the non-registered rights of those who used a conflicting mark *prior* to the registration date are expressly preserved by the Lanham Act.") (emphasis in original). "It is elementary that a trade-mark right is not acquired by registration. A right to trade-mark stems from prior appropriation and use." Bayshore Group Limited v. Bay Shore Seafood Brokers, Inc., 762 F.Supp. 404, 411 (D. Mass. 1991) ("The first to use a mark on a product or service in a particular geographic market, the senior user, acquires rights in the mark in that market… The senior user…may enjoin such uses that infringe upon its prior rights."); see also Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 815-16 (1st Cir. 1987). In Volkswagenwerk, the First Circuit affirmed the district court's grant of summary judgment in favor of a prior user who brought an action to enforce its common law service mark against a junior user. The court stated, "The right to trademark and service mark rights is based on prior use, or the one who first uses the marks in connection with a particular line of business. Trademark rights do not generally arise from registration. Registration does not

---

[5] According to its federal filing, the defendant claims that its first use of the name "Aftermath" was on April 20, 1999 (Cotter Aff. at ¶ 2); however, the plaintiff believes that until recently, the defendant did not use the name "Aftermath" in the New England States. Wiseman Aff. at ¶ 30.

9

create the underlying right in a trademark. That right which accrues from the use of a particular name or symbol, is essentially a common law property right." Id. at 815-16. (internal citations and quotations omitted).

2.    **The defendant is using a mark similar to the plaintiff's trademark.**

As discussed below in Section II(A)(3)(b)(i), the Aftermath mark used by the defendant is confusingly similar to the plaintiff's "AFTERMATH" trademark.

3.    **The defendant's use of the infringing mark has caused actual confusion and is likely to continue to cause confusion.**

a.    *The defendant's unequivocal intent to copy and improperly trade on the plaintiff's trademarks entitles the plaintiff to a presumption of likelihood of confusion.*

When the defendant learned of the plaintiff's thriving business in the New England States, the defendant intentionally set out to use the plaintiff's "AFTERMATH" trademark to appropriate the plaintiff's customers and business in those states. Such conduct creates a rebuttable presumption that there is a likelihood of confusion between the parties' services. Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 34 (1st Cir. 1989) (where defendant intentionally copies trademark, likelihood of confusion is presumed). That the defendant intended to copy and create confusion with the plaintiff's mark is absolutely clear from its conduct as described above, including: (1) the past history of the parties' relationship, in which the defendant acknowledged the value of the plaintiff's "AFTERMATH" mark, (2) the defendant's selection of a confusingly similar mark for its business and services, (3) the defendant's focused advertising, using the plaintiff's "AFTERMATH" mark, to market the defendant's services to the plaintiff's customers and potential customers in the New England States without disclosing its Illinois base; (4) the defendant's accepting requests for services and performing business for customers who in all likelihood it knew intended to contact the plaintiff's company. The Court need go no further to determine that the defendant accomplished what it set out to do – cause a likelihood of confusion. Nevertheless, there is ample additional evidence, as discussed below.

10

b.     *In addition to the presumption of likely confusion, application of the eight factor analysis set forth by the First Circuit likewise favors the plaintiff.*

In analyzing whether there is a likelihood of confusion between trademarks, the First Circuit

adopted an eight factor test in Boston Athletic Ass'n, 867 F.2d at 29. These factors are:

(1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark.

Id. A discussion of each of these factors follows.

(i)     Similarity of the marks.

The plaintiff's "AFTERMATH" trademark and the defendant's Aftermath mark are identical so

there is no question that customers could find the "total effect" of the marks to be confusingly similar.

See, e.g., Star Fin. Services v. Aastar Mortgage Corp., 89 F.3d 5, 10 (1st Cir. 1996). Indeed, multiple

instances of confusion have already occurred.

(ii)     Similarity of the services.

In this case, the parties provide identical services, namely the cleaning and restoring of bio-

hazard crime and trauma sites. Indeed, the parties first met at a conference sponsored by the ABRA

for companies involved in this business, and the defendant, who had originally registered for the

conference under the name "After Crime Cleanup, Inc.," decided to change its name to "Aftermath"

upon learning of the plaintiff's name for its own similar business. Wiseman Aff. at ¶12.

(iii – v) Similarity of the parties' channels of trade, advertising and prospective purchasers.

The parties' "channel of trade" is to seek out persons, such as police departments, local housing

authorities, and property managers, who are responsible for the cleaning and restoring of sites at

trauma and crime scenes, and to send them various promotional materials – including brochures,

magnets, and business cards – by mail. Both parties further promote their services on their own

11

websites and by word of mouth. Each party also has a publicly-listed toll-free 1-800 phone number for taking customers' orders, which is prominently displayed on its promotional materials. In fact, as discussed above, the parties have sent virtually identical types of advertisements to the same persons, showing a complete overlap in the parties' target audience. Furthermore, as discussed above, the "classes of purchasers" are the same; indeed, it is the individuals who receive the parties' promotional materials that constitute the "channels of trade" for these businesses. And, in the New England States, the defendants not only have similar individuals using their services, in many cases they have the same individuals, who, admittedly, have been confused about which entity they are dealing with. See, e.g., Walker Seitz Aff. at ¶ 4-10; Raymond Aff. at ¶ 5-7. Accordingly, all of these factors weigh in favor of a likelihood of confusion.

(vi)    Evidence of actual confusion.

Even if the above factors were not present, however, the most compelling evidence of the confusion caused by the defendant's wrongdoing is the actual confusion that it has already caused among the plaintiff's customers. See, e.g., Three Blind Mice Designs Co., Inc. v. Cyrk, Inc., 892 F.Supp. 303, 312 (D.Mass. 1995) ("Actual confusion is often taken to be the most persuasive possible evidence that there is a likelihood of confusion."), citing Calamari Fisheries, Inc. v. Village Catch, Inc., 698 F.Supp. 994, 1011 (D.Mass. 1988); Planned Parenthood Fed'n v. Problem Pregnancy of Worcester, Inc., 398 Mass. 480, 489 (1986) (actual confusion "is the best evidence of likelihood of confusion").

Here, there have been multiple instances of customers accidentally contacting the defendant when they intended to contact the plaintiff to hire the plaintiff for a job. For example, in April 2004, a state trooper referred a family to contact "Aftermath," and the family accidentally called the defendant's business rather than the plaintiff's. Wiseman Aff. at ¶ 36-37. Mary Lou Walker Seitz of State Street Development Management Company – one of the plaintiff's regular customers – indicated

12

that her company accidentally hired the defendant's company for a job, believing that they were hiring the plaintiff. Id. at ¶ 40; Walker Seitz Aff. at ¶ 4-11. Similarly, an employee at Kane Funeral Home – another customer of the plaintiff – referred a matter to the defendant's company believing that it was hiring the plaintiff's company. Wiseman Aff. at ¶41; Raymond Aff. at ¶ 6-7. The plaintiff has additionally received a check which was intended for the defendant. Wiseman Aff. at ¶ 42. In or around April 2005, a building manager indicated that she intended to contact the plaintiff to request a job, but accidentally contacted the defendant's business. Id. at ¶ 44. The Plaintiff was further informed by an attorney that he had intended to hire the plaintiff to perform a job, but had accidentally contacted and hired the defendant. Id. at ¶ 45.

In addition, the plaintiff has been contacted inadvertently by parties who intended to contact the defendant to complain about the quality of the defendant's services. For example, an inspector at the New Jersey Department of the Environmental Protection Agency accidentally contacted the plaintiff to discuss violations by "Aftermath," when she intended to contact the defendant. Id. at ¶ 46. The strong evidence of actual confusion which has occurred in this case is a clear indication that the defendant's mark has been, and is likely to continue to be, confused with the plaintiff's trademark.

(vii)    The defendant's intent to copy.

In addition to warranting a presumption of a likelihood of confusion, the defendant's obvious intent to copy the plaintiff's mark is separately a factor that weighs in favor of finding a likelihood of confusion. See Boston Athletic Ass'n, 867 F.2d at 34-35. Here, there is evidence that the defendant intended to copy the plaintiff's mark. After the parties met at an ABRA conference in Las Vegas in or around September 1999, the defendant changed its name from "After Crime Cleanup, Inc." to "Aftermath, Inc." Wiseman Aff. at ¶12. Moreover, the defendant's intent to trade on the plaintiff's "AFTERMATH" trademark in the New England States is unmistakable. As a threshold matter, the defendant is well aware of the plaintiff, its business, and its name. Further, the defendant's advertising

13

materials are intentionally misleading. Not only do the defendant's promotional materials in the New England States omit the defendant's business address, but they also deceptively state that the defendant's business is "locally owned and operated." Id. at ¶ 33.

(viii)  The strength of the plaintiff's mark.

The strength of a mark is shown by, among other factors, "the length of time a mark has been used and the plaintiff's relative renown in its field . . . ; the strength of the mark in plaintiff's field of business, especially looking at the number of similar registered marks; and the plaintiff's actions in promoting its mark." See Boston Athletic Ass'n, 867 F.2d at 32 (internal citations omitted). The plaintiff's trademark "AFTERMATH" has been in continuous use in the New England States since February 1999. Beginning in February 1999, the plaintiff heavily promoted its "AFTERMATH" mark through word of mouth, promotional mailings, and other forms of advertising, resulting in a high degree of consumer awareness.

Under each and every one of the factors listed above, there is an extremely high likelihood of consumer confusion between the defendant's and the plaintiff's trademark. Accordingly, the plaintiff is likely to prove a likelihood of confusion, and succeed on the merits of its infringement claim.

B.    The Plaintiff Will Succeed on Its Lanham Act Claim.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides, in pertinent part, the following:

Any person who . . . uses in commerce . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which . . . in commercial advertising or promotion misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

See 15 U.S.C. § 1125(a).

The U.S. Court of Appeals for the First Circuit has held that the elements of a Lanham Act claim are (1) the defendant has made false or misleading statements as to his own services [or

14

another's]; (2) there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised services involved interstate commercial activities; and (5) there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc. See Clorox Co. Puerto Rico v. Procter & Gamble, 228 F.3d 24, 33 n.6 (1st Cir. 2000). The defendant's wrongful conduct here satisfies each of these elements.

First, the defendant has made false and misleading statements as to the services it offers by identifying those services with the plaintiff's trademark. This has caused, and is likely to cause, confusion among the intended consumer audience, as discussed above. Second, such confusion is deceptive, as it leads consumers into believing that they are dealing with the plaintiff when they are not. Third, this deception will clearly affect purchasing decisions, as customers who intended to use the plaintiff's services may never contact the plaintiff; alternatively, customers could be dissuaded from doing business with the plaintiff by attributing to the plaintiff their negative experiences in dealing with the defendant. Fourth, both parties' services are available in multiple states. Fifth, the defendant's activities are not only injuring the plaintiff's business, sales, and reputation, but that injury is likely to be irreparable, as discussed in Section III, below. Thus, the plaintiff is likely to succeed on its Lanham Act claim.

## C.     The Plaintiff Will Succeed on Its Massachusetts Common Law Palming Off Claim.

Under Massachusetts law, "'Palming off' or 'passing off' is an attempt to deceive the public into believing it is trading with one person when in fact it is dealing with another." Datacomm, 396 Mass. at 769. The Massachusetts doctrine of palming off comprehends an attempt to create "confusion as to the source of goods and services," and requires a likelihood of such confusion to succeed. See id. The doctrine also extends to attempts to confuse customers into believing that the plaintiff sponsored or endorsed the defendant's use of its marks, or that there is some other affiliation

15

between the parties. Planned Parenthood Fed'n., 398 Mass. at 489. As discussed above, the

defendant's intentional use of a mark confusingly similar to the plaintiff's mark in the New England

States is likely to confuse consumers into believing that they are dealing with the plaintiff when they

are not; indeed, such confusion has already occurred. Accordingly, the plaintiff is likely to succeed on

this claim.

D.     The Plaintiff Will Succeed on Its Claim for Dilution and Tarnishment Pursuant to G.L.
       c. 110B, § 12.

Massachusetts General Laws chapter 110B, § 12 provides that:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a
mark registered under this chapter, or a mark valid at common law, or a trade name
valid at common law, shall be a ground for injunctive relief notwithstanding the absence
of competition between the parties or the absence of confusion as to the source of goods
or services.

Under this statute, the owner of a distinctive trademark can obtain injunctive relief where there

is "injury resulting from a use of the mark that tarnishes the reputation associated with the plaintiffs'

mark." Hasbro, Inc. v. Clue Computing, Inc., 66 F. Supp. 2d 117, 137 (D. Mass. 1999), aff'd, 232

F.3d 1 (1st Cir. 2000) (internal citation omitted). In this case, by copying the plaintiff's

"AFTERMATH" trademark, the defendant has associated its mark with the plaintiff's business. There

have been multiple instances of the plaintiff's customers inadvertently contacting the defendant, and

also of the defendant's customers contacting the plaintiff to complain about the defendant's services.

Wiseman Aff. at ¶¶ 35-37, 40-45. In fact, an inspector at the New Jersey Environmental Protection

Agency inadvertently contacted the plaintiff to discuss the defendant's violations and failure to comply

with regulatory procedures in connection with its services. Id. at ¶ 46. To the extent that the

defendant's services have been, and will continue to be, attributed to the plaintiff's business, the

defendant's use of plaintiff's mark is causing tarnishment of the mark.

E.    The Plaintiff Will Succeed on its Unfair Competition Claim.

Under Massachusetts law, a plaintiff may recover for unfair competition by demonstrating either palming off, or that a trademark used in connection with the product or service has acquired a secondary meaning such that confusion as to its source is likely to arise if the defendant is allowed to copy it. See, e.g., Pic Design Corp. v. Bearings Specialty Co., 436 F.2d 804, 807 (1st Cir. 1971); Datacomm, 396 Mass. at 768-69. "Under either theory, it is evident that the gravamen of an unfair competition claim is the likelihood of consumer confusion as to the source of the goods or services." Datacomm, 396 Mass. at 769; see also Polo Fashions, Inc. v. Branded Apparel Merchandising, Inc., 592 F.Supp. 648, 652 (D.Mass. 1984).

Here, the plaintiff is likely to succeed on a claim for palming off, as discussed above in Section II(C). The plaintiff has also demonstrated that its mark is well known in the New England States and associated with only one source – the plaintiff. The plaintiff has shown that confusion as to source is likely to arise (and, in fact, has arisen) based on the defendant's copying the plaintiff's mark. Here, the plaintiff began using the "AFTERMATH" trademark in commerce in the New England States prior to the defendant's use or registration of the term in those states. The defendant's use of "Aftermath" in connection with its business in those states has led to multiple instances of actual customer confusion, as described above. Further, the facts establish that the plaintiff is intentionally attempting to trade on the plaintiff's good will and reputation in the New England states. Accordingly, the defendant's use of the "AFTERMATH" mark in the states in which the plaintiff has prior use constitutes a claim for unfair competition under Massachusetts law.

F.    The Plaintiff Will Succeed on Its Chapter 93A Claim.

M.G.L. c. 93A prohibits unfair or deceptive trade practices in trade or commerce. See M.G.L. c. 93A, § 2. Generally, a practice is unfair if it is "within . . . the penumbra of some common-law, statutory, or other established concept of unfairness; . . . is immoral, unethical, oppressive, or

17

unscrupulous; . . . [and] causes substantial injury to [others]." PMP Associates Inc. v. Globe

Newspaper Co., 366 Mass. 593, 596 (1975). The conduct described above constitutes a violation of

G.L. c. 93A. See, e.g., R.J. Toomey Co. v. Toomey, 683 F. Supp. 873, 879 (D. Mass. 1988) (finding

that conduct which constituted violation of § 43(a) of the Lanham Act also constituted violation of

G.L. c. 93A).[6] Moreover, the defendant's conduct violates specific regulations promulgated by the

Attorney General's office pursuant to its authority under G.L. c. 93A, § 2(c). In particular, the

Attorney General has restricted advertising which creates a false impression of origin.[7] 940 C.M.R. §

3.02(2). By using a mark confusingly similar to the plaintiff's trademark in its advertising, the

defendant is creating a false impression of origin and violating G.L. c. 93A.

III.  THE PLAINTIFF WILL SUFFER SUBSTANTIAL AND IRREPARABLE HARM IF THE
      INJUNCTION IS NOT ALLOWED.

In the trademark context, irreparable harm is presumed if a plaintiff demonstrates a likelihood

of success on the merits of its claims. "Having determined that there was a high probability of

consumer confusion . . . 'injury [is] irreparable in the sense that it may not be fully compensable in

damages almost inevitably follows.'" Camel Hair & Cashmere Inst. v. Associated Dry Goods Corp.,

799 F.2d 6, 15 (1st Cir. 1986). See also Hypertherm, Inc. v. Precision Products, Inc., 832 F.2d 697,

700 (1st Cir. 1987) (consumer confusion and uncertainty is "a potent basis for a finding of

irremediable injury. Few harms are more corrosive in the marketplace than the inability of a trademark

holder to control the quality of bogus articles thought (erroneously) to derive from it. The threat of

---

[6] See also Picciuto v. Dwyer, 32 Mass. App. Ct. 137, 138-39 (1992) (conduct arising to level of "improper purpose or improper means" of interference with prospective business relations also violated c. 93A); A.F.M. Corp. v. Corporate Aircraft Mgmt., 626 F. Supp. 1533, 1551 (D. Mass. 1985) (claim for interference with contract is clearly "within at least the penumbra of some common law . . . concept of unfairness" actionable under c. 93A).

[7] 940 C.M.R. § 3.02(2) states: "No statement or illustration shall be used in any advertisement which creates a false impression of the grade, quality, make, value, currency of model, size, color, usability, or origin of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised product to another. Even though the true facts are subsequently made known to the buyer, the law is violated if the first contact ... is secured by deception."

substantial damage to . . . hard won business and reputation made out a sufficient showing of irreparable harm to warrant immediate redress.").

Even if irreparable harm were not presumed, there is ample evidence of it here. First, the defendant's acts have caused actual consumer confusion and will likely continue to cause substantial confusion. Second, the defendant has caused and will continue to cause irreparable harm to the plaintiff's relationships with its customers by appropriating those relationships and diminishing the association of the trademark "AFTERMATH" with the plaintiff's business. Third, the plaintiff has been associated in the minds of consumers with poor quality work performed by the defendant. For example, an inspector at the New Jersey Department of the Environmental Protection Agency accidentally contacted the plaintiff to discuss violations by "Aftermath," when she intended to contact the defendant. Wiseman Aff. at ¶ 45. If the defendant is not stopped, the plaintiff's mark will be further tarnished and its value diminished by this negative association, and the defendant will irretrievably damage or even destroy the goodwill associated with the plaintiff's trademark.

IV.     THE DEFENDANT WILL NOT BE HARMED BY ISSUING THE INJUNCTION, AND
        THE PUBLIC INTEREST FAVORS ISSUING THE INJUNCTION.

In contrast, if the injunction is allowed, the defendant will suffer no irreparable harm. It can continue to use the "Aftermath" mark in every state except Massachusetts, Rhode Island, Connecticut, and New Hampshire, and in those four states, the defendant can simply change the name of its business to a non-infringing one. Further, the defendant assumed the risk of its actions in setting out to trade on the plaintiff's mark. The defendant was aware of the plaintiff's business and trade name, and knowingly selected a confusingly similar name. The defendant is now promoting its business in the New England States for the purpose of trading on the plaintiff's business reputation. The defendant chose to proceed on that course even after being on explicit notice that the plaintiff had senior rights to the mark in those states. Accordingly the defendant is estopped from claiming any harm, and the balance of equities tips decidedly in favor of the plaintiff. See Aura Communications, Inc. v. Aura

19

Networks, Inc., 148 F. Supp. 2d 91, 97 (D. Mass. 2001) (in light of actual confusion caused by defendants, balance of harms favored the plaintiff, even if the injunction would cause the defendant financial hardship).

Finally, the public interest favors the issuance of an injunction. See, e.g., Hypertherm, Inc., 832 F.2d at 700 (public interest in favor of injunction in trademark action given "societal value of full disclosure and fair competition"). This is particularly true where, as here, the public is being actively misled by the defendant's activities.

## CONCLUSION

For the foregoing reasons, the plaintiff respectfully requests that the Court issue a preliminary injunction in the form set forth in the plaintiff's motion, enjoining the defendant from using the term "Aftermath" or any other term confusingly similar to the plaintiff's trademark in the New England States, enjoining any further solicitation of the plaintiff's customers or misappropriation of the plaintiff's business by the defendant in those states, and requiring the defendant to take certain actions to mitigate the infringement and resulting confusion that has occurred.

Respectfully submitted,

AFTERMATH CLEANING COMPANY, INC.

By its attorneys,

*Samantha L. Gulovin*

Brenda M. Cotter (BBO #548004)
Samantha L. Gerlovin (BBO #652389)
BROWN RUDNICK BERLACK ISRAELS LLP
One Financial Center
Boston, MA 02111
Dated: July 27, 2005    Tel. (617) 856-8200

20

## CERTIFICATE OF SERVICE

I, Samantha L. Gerlovin, counsel for the plaintiffs, do hereby certify that on this day, July 27,

2005, I served a copy a copy of the foregoing Memorandum of Law in Support of Plaintiff's Motion

for a Preliminary Injunction by First Class Mail and Federal Express to counsel for the defendant:

> Edward F. Perlman, Esq.
> Wolf, Greenfield & Sacks, P.C.
> 600 Atlantic Ave.
> Boston, MA 02210-2266

> Michael A. Hierl, Esq.
> Olson & Hierl, Ltd.
> 20 N. Wacker Drive
> 36th Floor
> Chicago, IL 60606

<span style="padding-left:4em;">*Samantha L. Gerlovin*</span>
Samantha L. Gerlovin

Dated: July 27, 2005

# 1375971 v2 - GERLOVSL - 025173/0001

21